**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 20-4162**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

AMAR KHALID ABED, a/k/a Omar,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Michael F. Urbanski, Chief District Judge.  (7:97-cr-00024-MFU-3)

Argued:  March 12, 2021                          Decided:  June 29, 2021

Before NIEMEYER, KEENAN, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Keenan and Judge Harris joined.

**ARGUED:**  Christine Madeleine Lee, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Roanoke, Virginia, for Appellant.  Jonathan Patrick Jones, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.  **ON BRIEF:** Juval O. Scott, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Roanoke, Virginia, for Appellant.  Thomas T. Cullen, United States Attorney, Roanoke, Virginia, Jennifer Bockhorst, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

In 1998, Amar Khalid Abed was sentenced to 570 months' imprisonment following his conviction on numerous counts of racketeering and related offenses. Over 20 years later, after one count constituting a 360-month component of his sentence was vacated because of a change in the law, he was resentenced to 360 months' imprisonment, which was an upward variance from the recommended Sentencing Guidelines range of 188 to 235 months' imprisonment.

Abed now contends, among other things, that his new sentence violates the Ex Post Facto Clause and the Due Process Clause and that it is in various respects procedurally and substantively unreasonable. For the reasons that follow, we affirm.

I

At a two-month trial that took place in 1998, the government proved the operation of a violent criminal enterprise in and around Roanoke, Virginia, that was headed by Abed's uncle, Joseph Abed, and that included two of his younger brothers, his cousin, and at least three others. As shown, Abed played a central role in the enterprise's activities.

From 1992 to 1995, Abed and his associates distributed cocaine, cocaine base, marijuana, and other drugs. Moreover, to retaliate against business rivals or otherwise advance the enterprise's interests, Abed and others engaged in arson and attempted arson, which, on one occasion, involved the use of a "Molotov cocktail" to burn down a store. The government also attempted to prove that Abed was responsible for an apartment fire that killed two people under very suspicious circumstances, but the jury acquitted Abed on

the portion of the count making that charge. Nonetheless, there was extensive evidence that Abed repeatedly used violence and the threat of violence during the course of the enterprise, not only to enlist participation but also to rob members of the public. And members of the enterprise also routinely committed property offenses — such as slashing tires and burglarizing homes and vehicles.

Following the trial, the jury found Abed guilty on eight counts charging him with racketeering, conspiracy to commit racketeering, arson, conspiracy to commit arson, conspiracy to distribute illicit drugs, and the use of a destructive device (i.e., a Molotov cocktail) during a crime of violence (i.e., arson), in violation of 18 U.S.C. § 924(c).

Prior to sentencing, which took place in August 1998, the Probation Office prepared a presentence report calculating a Sentencing Guidelines range of 188 to 235 months' imprisonment for Abed's convictions on seven counts, to be followed by a mandatory 360 months for his conviction under § 924(c), for an aggregate Guidelines sentencing range of 548 to 595 months' imprisonment. The government, though, sought an upward departure on the ground that the Guidelines did not adequately account for the full extent of Abed's criminal conduct. The government argued that while the court had "heard a legion of testimony concerning Amar Abed's theft-related activity, robbery-related activity, assaultive behavior, stabbings, beatings and all manner of things," "all this constant criminal activity he was engaged in for a several-year period, almost daily criminal activity," "ha[d] had no effect upon the Guidelines whatsoever." The district court, however, denied the government's motion for an upward departure, concluding that the mandatory 30-year sentence for the § 924(c) offense, combined with "the Guideline range

3

of 188 to 235 months, [gave] [it] an appropriate range within which to sentence [Abed]." Under these circumstances, the court explained, "an upward departure [was] just simply unnecessary to carry out any appropriate philosophy of sentencing."

In view of this ruling, the government requested that the court impose the maximum Guidelines sentence of 595 months' imprisonment. Abed, on the other hand, requested a sentence below or at least at the low end of the Guidelines range, noting that he had been "a model soldier" in Operation Desert Storm prior to the criminal conduct at issue and requesting, without elaboration, that the court "take note of the effect that his time in the military had upon him." The court imposed a total sentence of 570 months' imprisonment, consisting of concurrent terms of 210 months' imprisonment and the mandatory consecutive 360-month term for the § 924(c) offense. Abed's 570-month sentence was the longest imposed on a member of the criminal enterprise.

On direct appeal, we affirmed Abed's convictions and sentence. *See United States v. Abed*, 203 F.3d 822 (4th Cir. 2000) (per curiam).

In 2016, Abed filed a successive motion under 28 U.S.C. § 2255, challenging his conviction and sentence on the § 924(c) count based on the Supreme Court's intervening decision in *Johnson v. United States*, 576 U.S. 591 (2015), which invalidated as unconstitutionally vague the residual clause used to define "violent felony" in the Armed Career Criminal Act. His motion remained pending until the Supreme Court handed down its decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), which similarly invalidated as unconstitutionally vague the residual clause used to define "crime of violence" in § 924(c). Following *Davis*, the government conceded that the federal arson offense that

4

had been used as the predicate crime of violence for Abed's § 924(c) conviction no longer categorically qualified as a crime of violence. *See United States v. Salas*, 889 F.3d 681, 684 (10th Cir. 2018) (recognizing that federal arson does not qualify as a crime of violence under § 924(c)'s "elements clause" because it "does not require, as an element, the use of force against the property 'of another'"). Accordingly, the government acknowledged that Abed's § 924(c) conviction and sentence should be vacated.

In response, Abed contended that the 360-month sentence for his § 924(c) conviction should simply be excised and that, because he had already served more than 255 months of his sentence — exceeding the total 210 months' sentence imposed on the seven remaining counts — he should be released immediately. In seeking that relief, Abed argued that, under the Ex Post Facto Clause, the maximum sentence the court could impose at any resentencing was 235 months — the top of the Guidelines range — because at his original sentencing, "the district court had no choice but to impose" a sentence within the range provided by the Guidelines, which were then mandatory. He further maintained that "[a] sentence above the originally calculated guideline range would also violate due process" under *North Carolina v. Pearce*, 395 U.S. 711 (1969), *partially overruled by Alabama v. Smith*, 490 U.S. 794 (1989), because it would amount to "punishment for having successfully attacked the earlier judgment." The government maintained, however, that the appropriate remedy was to conduct a full resentencing on Abed's seven remaining convictions.

The district court granted Abed's § 2255 motion and vacated his § 924(c) conviction and the 360-month sentence imposed for that offense. It denied, however, Abed's motion

5

for immediate release, agreeing instead with the government that the appropriate next step was to conduct a full resentencing hearing with respect to the remaining seven counts on which Abed had been convicted. The court rejected Abed's ex post facto argument, noting that it would "use Sentencing Guidelines that are no higher than those in effect at the time [Abed] [was] originally sentenced" and explaining that, under *United States v. Booker*, 543 U.S. 220 (2005), it was required to treat the Guidelines as *advisory* rather than *mandatory* to avoid a Sixth Amendment violation. With respect to Abed's due process argument, the court noted that under *United States v. Ventura*, 864 F.3d 301, 310 (4th Cir. 2017), no "presumption of vindictiveness" would arise so long as Abed's aggregate sentence following his resentencing was not higher than his original aggregate sentence.

In preparation for Abed's resentencing in February 2020, the Probation Office prepared a new presentence report and, as was the case at his original sentencing, determined that the Guidelines sentencing range for the seven convictions was 188 to 235 months' imprisonment. The presentence report also noted that during Abed's more than two decades of incarceration, Abed had received only five disciplinary infractions, the most recent having occurred approximately nine years earlier in January 2011. The report shared that Abed had also completed a large number of different types of courses in prison, including "college level courses in business and computer science," anger management classes, and a non-residential drug treatment program. Regarding Abed's background, the report stated that, before committing the underlying offenses, Abed had been enlisted in the U.S. Marine Corps from December 1989 until his honorable discharge in October 1991, during which time he served in Operation Desert Storm and was "awarded the Navy

6

Achievement Medal for professional achievement in the superior performance of his duties while assigned as [an] Arabic translator." The report also noted that following his combat experience, Abed was diagnosed with post-traumatic stress disorder ("PTSD") for which he received 50% disability benefits from 1994 until shortly after his arrest in March 1997. Those disability benefits were subsequently increased to 100%, based on a finding regarding the severity of Abed's PTSD.

Also before the resentencing, Abed filed a sentencing memorandum in which he requested a within-Guidelines sentence. He emphasized his harrowing experiences during his Gulf War tour of duty and the valuable contributions he had made as an Arabic translator. He also explained that during the period he was regularly committing crimes, he was hospitalized several times at Veterans Affairs facilities to receive treatment for his PTSD. In addition, Abed presented evidence from the Bureau of Prisons ("BOP") indicating that he had made significant progress toward rehabilitation during his time in prison. Most striking, several prison staff members who supervised Abed's institutional work wrote letters on his behalf attesting to his work ethic and dependability. One wrote, "Abed has been a trustworthy and indispensable asset within the medical department . . . . I must personally stress the point that this individual is several steps ahead of the average prisoner as it relates to rehabilitation . . . . He can be trusted in the absence of staff and relied upon to complete [tasks]." Another described Abed as "a good role model" who was "kind, reliable and responsible with his job [as a hospital orderly] and in his daily routine." A third wrote that he had "found it gratifying" to supervise someone with Abed's "work

7

ethic" and expressed confidence that Abed would "do well within society if given the opportunity."

The government also filed a memorandum, in which it did not dispute Abed's PTSD diagnosis or the extent of his rehabilitation in prison. Rather, it focused on the severity of Abed's criminal offenses and argued that the court should use either an upward departure or an upward variance to impose "a sentence at or near the previously-imposed sentence of 570 months." It noted that "[t]his racketeering case [was] far outside the heartland of typical arson and typical drug cases." Indeed, the government represented to the court that Abed's conduct was "truly among the worst that ha[d] been prosecuted in this district in the last 30 years." Thus, while the government agreed that it was appropriate for the court to consider both Abed's PTSD and his "satisfactory post-conviction conduct," it maintained that "[a] sentence within the guideline range [i.e., 188 to 235 months' imprisonment] would be astoundingly low" given "the breadth, scope, and violence of his criminal conduct."

The district court conducted a plenary resentencing hearing on February 13, 2020, at which it received evidence, heard arguments from counsel, and heard directly from Abed himself. At the hearing, Abed presented expert testimony from a psychiatrist who had worked at the Department of Veterans Affairs for 30 years and who testified that Abed had "a severe case of PTSD" that had "substantially contributed to his adopting a criminal lifestyle." The expert noted that "the most critical symptoms of PTSD involve reliving of the traumatic events," which in Abed's case involved "witnessing dismembered bodies," enemy combatants being killed in combat, and people dying at the medical aid station

8

where he served as a translator. The expert also noted that other symptoms include disturbances in mood and cognition, outbursts of anger, insomnia, and difficulty concentrating. In addition, several members of Abed's family testified regarding the changes they had witnessed in Abed during his incarceration and their willingness and ability to help him adjust following his release from prison. Also at the hearing, Abed's counsel continued to argue that a within-Guidelines sentence was appropriate given the mitigation and rehabilitation evidence. She acknowledged, however, that "Abed . . . ha[d] a greater culpability than his cousin Rayed, who received 300 months [at his resentencing]," and based on this, she argued that if the court decided that it was not constrained to impose a sentence within the Guidelines range, "a sentence of 312 months" — which would essentially amount to a time-served sentence given Abed's good-time credits — would be "adequate but not greater than necessary to meet the objectives of the sentencing statute."

Taking the various presentations and arguments into account, the court imposed an upward variance sentence of 360 months' imprisonment. In doing so, it recognized that the law "required" it to begin "with consideration of the advisory sentencing" range, which it found to be 188 to 235 months' imprisonment. Assessing the 18 U.S.C. § 3553(a) factor of "the history and characteristics of the defendant," the court noted both that "the person who is here now is an awful lot different than the person who appeared [for sentencing] in 1998" and that "[t]he defense has effectively argued for a reduction based on [Abed's] . . . combat service in Iraq, and the effects of that on him, evidenced by his now 100 percent service-connected disability for PTSD." The court observed that it found it "pretty

9

compelling" that "at the time that some of these crimes were going on, [Abed] was also seeking treatment at the [Veterans Affairs] Medical Center," and it noted that, at the time of Abed's original sentencing, there was not the same "recognition . . . as to what a serious problem" PTSD represented for a significant number of combat veterans. The court stated that Abed's PTSD was "certainly a factor that [it was] considering." The court also credited Abed's rehabilitation evidence, remarking that based on the letters from the BOP staff, the efforts Abed had made "to better himself through the course work," and his relatively clean disciplinary record, it was "evident" that Abed "is a changed person, a rehabilitated person."

At the same time, the court stressed that it was also required to consider "the nature and circumstances of the offense," which it characterized as "a widespread crime spree for a number of years," involving multiple instances of arson, robberies, drug dealing, and "a whole pattern of violent criminal behavior." The court further emphasized that "Abed was the most culpable" of the defendants involved in the racketeering enterprise, as made "plain from the sentences" the judge who presided over the trial had imposed in 1998.

"[B]alancing all these factors" and recognizing "the serious nature of the crime" but also Abed's "apparent rehabilitation" and the likely impact of his PTSD, the court concluded that "a sentence of 360 months [was] sufficient but not greater than necessary in this case." "[This] means that Mr. Abed has a little more time to serve, but it also means that within, at least the way I calculate it [with good-time credits], less than three years he is subject to being released."

10

From the district court's entry of an amended judgment dated February 25, 2020, Abed filed this appeal.

II

Abed contends first that the district court lacked authority to impose a variance sentence above the Guidelines' maximum of 235 months' imprisonment on the seven counts of conviction that remained following the vacatur of his § 924(c) conviction. Originally, Abed received a total sentence on those seven counts of 210 months' imprisonment, a sentence within the Guidelines' then-mandatory range of 188 to 235 months' imprisonment. He argues that the district court's new total sentence of 360 months' imprisonment on the same seven counts violates (1) the Ex Post Facto Clause of the Constitution, (2) the Fifth Amendment's Due Process Clause, and (3) the law of the case doctrine. We address each of these arguments in turn.

A

Abed argues first that the district court — in treating the sentencing range provided by the Guidelines as advisory and imposing an upward variance sentence of 360 months' imprisonment — violated the Ex Post Facto Clause because the variance sentence was a greater punishment than he could have received under the law in effect at the time the crimes were committed, i.e., when the primary federal sentencing statute required courts to treat the Guidelines as *mandatory*. *See* 18 U.S.C. § 3553(b)(1). Thus, according to Abed, the use of the "amended version of" § 3553, under which the Guidelines are

11

*advisory*, to "increase to 360 months a sentence which in 1998 would have been capped at 235 months violated the *ex post facto* clause."

Through two Ex Post Facto Clauses, "[t]he Constitution prohibits both federal and state governments from *enacting* any 'ex post facto Law.'" *Peugh v. United States*, 569 U.S. 530, 538 (2013) (emphasis added); U.S. Const. art. I, § 9, cl. 3 ("No . . . ex post facto Law shall be passed"); U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . ex post facto Law"). By virtue of the first of these two clauses, Congress may not enact a law that "inflicts a greater punishment[] than the law annexed to the crime, when committed." *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.). The Supreme Court recognized more recently that, because of their central role in sentencing, changes made to the Sentencing Guidelines between when a crime was committed and when a defendant is sentenced can amount to an "ex post facto law" — specifically, "there is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." *Peugh*, 569 U.S. at 533.

When Abed was first sentenced, his Guidelines sentencing range of 188 to 235 months' imprisonment was *mandatory*, but after he was sentenced, that range became *advisory*, and the district court, relying on this, imposed a variance sentence above that range at his resentencing. The change from mandatory to advisory Guidelines resulted from the Supreme Court's decision in *Booker*, where the Court held that under a sentencing scheme in which the Sentencing Guidelines were mandatory, it violated the Sixth

12

Amendment for a sentencing judge to find facts that raised the defendant's Guidelines range above "the maximum authorized by the facts established by a plea of guilty or a jury verdict." 543 U.S. at 244. To remedy this Sixth Amendment problem, the Court "severed and excised" 18 U.S.C. § 3553(b)(1), thus "making the Guidelines effectively advisory." *Id.* at 245. Yet, according to Abed, the Ex Post Facto Clause should have prevented the district court from applying *Booker* fully because the Clause required the court to treat 235 months' imprisonment — the top of his Guidelines range — as the upper limit for his resentencing.

Abed's argument against the retroactive application of *Booker*, however, has been "universally rejected by the federal courts," including our own. *United States v. Davenport*, 445 F.3d 366, 369–70 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008). "As the text of the [Ex Post Facto] Clause makes clear, it 'is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.'" *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Marks v. United States*, 430 U.S. 188, 191 (1977)). While the Supreme Court has observed that some "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process," *id.*, there is no plausible argument that any such limitations were violated here, given that the *Booker* Court itself concluded that it was necessary to apply its "remedial interpretation of the Sentencing Act . . . to all cases on direct review," even though those crimes, like Abed's, had necessarily been committed when the Guidelines were mandatory, 543 U.S. at 268; *see also United States v. Vaughn*, 430 F.3d 518, 525 (2d Cir. 2005) (Sotomayor, J.) (joining other circuits

13

"in rejecting an *ex post facto* claim based on the remedial holding in *Booker*").
Accordingly, we reject Abed's ex post facto challenge to his upward variance sentence.

B

Abed next contends that the district court's imposition of a sentence on his remaining seven convictions that is greater than the sentence he received on those convictions at his original sentencing violated the Due Process Clause because the greater sentence "effectively punish[ed]" him for successfully challenging his § 924(c) conviction. He argues that "[b]ecause the *only* ground for increasing [his] . . . sentences [on the remaining seven counts] is that he successfully sought to vacate his 30-year consecutive sentence, the increased sentence in this case [is] constitutionally unsustainable." In making this argument, he relies on *Pearce*, where the Supreme Court recognized that "[d]ue process of law . . . requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." 395 U.S. at 725.

*Pearce* and its progeny establish that "[i]f a sentencing court increases a sentence on remand, the reasons for the court doing so must affirmatively appear." *Ventura*, 864 F.3d at 310 (cleaned up). Otherwise, a presumption may arise that a greater sentence has been impermissibly imposed for a vindictive purpose. *See id.* (citing *Alabama v. Smith*, 490 U.S. 794, 798–99 (1989)). Thus, the first step in determining "whether a sentence violates *Pearce* and its progeny" is determining "whether the new sentence is actually harsher than that imposed prior to [the] successful appeal." *Id.* (quoting *United States v.*

14

*Kincaid*, 964 F.2d 325, 328 (4th Cir. 1992)). And if we so conclude, "we will then consider whether the defendant has demonstrated actual vindictiveness or a reasonable likelihood of actual vindictiveness." *Id.*

In determining whether the defendant's sentence has actually been increased, we use the "aggregate package approach," rather than a "so-called count-by-count approach." *Ventura*, 864 F.3d at 310. And under the aggregate approach, "a sentence is not problematic so long as 'the ultimate sentence for one or more counts does not exceed that given for all counts sentenced at the conclusion of the first trial.'" *Id.* at 311 (quoting *United States v. Gray*, 852 F.2d 136, 138 (4th Cir. 1988)).

Comparing Abed's aggregate sentence in 1998 with his aggregate sentence in 2020, it is obvious that his term of incarceration did not increase; instead, it substantially decreased from 570 to 360 months' imprisonment. Thus, just as in *Ventura* — where the defendant was also resentenced following the vacatur of his § 924(c) conviction — "[b]ecause [Abed] did not receive an increased aggregate sentence, his attempt to establish a presumption of vindictiveness must fail." 864 F.3d at 311.

C

Finally, Abed contends that the district court lacked authority to impose an above-Guidelines sentence at his resentencing because of the law of the case doctrine. Specifically, he notes that at his original 1998 sentencing, the district court denied the government's motion for an upward departure, and, based on this, he argues that "[t]he

original sentencing court's adoption of the PSR's conclusion that the guidelines do in fact account for all of Mr. Abed's criminal conduct . . . is binding and cannot be revisited."

In making this argument, however, Abed conflates the original sentencing court's denial of the government's motion for an upward *departure* with the new sentencing court's decision to impose an upward *variance*, which are "two distinct sentencing options." *United States v. Rivera-Santana*, 668 F.3d 95, 100 n.6 (4th Cir. 2012) (explaining that "[a] departure is a sentence imposed under the framework set out in the Guidelines," whereas a variance is "a non-Guidelines sentence" that is "justified under the sentencing factors set forth in 18 U.S.C. § 3553(a)" (cleaned up)).

Beyond the attempt to compare distinct sentencing options that raise distinct legal questions, it is also clear that the original sentencing court's denial of the government's motion rested on its assessment that the "Guideline range of 188 to 235 months," *when combined with a mandatory 360-month consecutive sentence* for the § 924(c) offense, produced "an appropriate range within which to sentence this defendant," such that "an upward departure [was] just simply unnecessary to carry out any appropriate philosophy of sentencing." That the original sentencing court concluded that a sentence within an effective total Guidelines range of 548 to 595 months' imprisonment was "appropriate" clearly cannot preclude the resentencing court from determining that a sentence within the now-advisory range of 188 to 235 months' imprisonment would be inadequate.

Most decisively, however, Abed's law of the case argument is at odds with the Supreme Court's decision in *Pepper v. United States*, 562 U.S. 476 (2011). In *Pepper*, "the original sentencing judge . . . granted Pepper a 40-percent downward departure . . .

16

based on [his] substantial assistance." *Id.* at 505. But after the sentence was vacated on appeal and the case remanded for resentencing, a different district judge "instead granted only a 20-percent downward departure." *Id.* at 506. While Pepper argued "that the law of the case doctrine required [the second judge] to apply the same 40-percent departure granted by the original sentencing judge," the Supreme Court "disagree[d]." *Id.* at 506. It explained that because "[a] criminal sentence is a package of sanctions that the district court utilizes to effectuate its sentencing intent," a court of appeals that is "reversing one part of a defendant's sentence may vacate the entire sentence so that, on remand, the trial court can reconfigure the sentencing plan to satisfy the sentencing factors in 18 U.S.C. § 3553(a)." *Id.* at 507 (cleaned up). Because the court of appeals there had followed that course — "set[ting] aside Pepper's entire sentence and remand[ing] for a *de novo* resentencing" — the Supreme Court concluded that the district court on remand "was not bound by the law of the case doctrine to apply the same 40-percent departure that had been applied at Pepper's prior sentencing." *Id.* at 507–08; *see also United States v. Alston*, 722 F.3d 603, 607 (4th Cir. 2013) (relying on *Pepper* to conclude that, on remand for de novo resentencing, the district court was not bound by its original denial of the government's motion for an upward departure and explaining that "[p]rohibiting the district court from taking a holistic approach to [the defendant's] resentencing would not only undermine the district court's original sentencing intent, it would prevent the district court from making the very individualized assessment of [the defendant] required by § 3553(a)").

In this case, after the district court vacated Abed's § 924(c) conviction and sentence, it relied on *Pepper*'s recognition that "[a] criminal sentence is a package of sanctions,"

17

562 U.S. at 507 (cleaned up), to conclude that the "proper remedy" was to conduct a plenary resentencing on Abed's remaining seven convictions. Because the district court acted appropriately in doing so, it follows under *Pepper* that at that resentencing, the court was not required by the law of the case doctrine to adhere to the original sentencing judge's denial of the government's motion for an upward departure. *Id.* at 507–08. And in any event, the doctrine certainly did not preclude the court from imposing an upward variance, a sentencing option that was not even available at the time of Abed's original sentencing.

In sum, we conclude that neither the Ex Post Facto Clause nor the Due Process Clause nor the law of the case doctrine denied the district court authority to resentence Abed to a term of imprisonment above his advisory Guidelines range.

III

Abed also contends that, for numerous reasons, his new sentence of 360 months' imprisonment is procedurally and substantively unreasonable. We address each point in turn.

A

First and briefly, Abed contends in his opening brief that "the court erroneously adopted the government's view of what constitutes a 'heartland' case and thus erred in granting an *upward departure* on that basis." (Emphasis added). In his reply brief, however, Abed "concedes that the government appears to be correct" that the district court imposed the sentence as an *upward variance* based on its consideration of the § 3553(a) factors, not as an upward departure under U.S.S.G. § 5K2.0. We thus understand Abed to

18

have withdrawn his "heartland departure" argument and, in any event, agree that the record demonstrates that the district court imposed the above-Guidelines sentence at issue here as a variance, not a departure.

B

Abed contends next that "the sentence imposed in this case was unreasonable . . . because it created an unwarranted sentencing disparity between [him] and other similarly situated defendants." He notes that at the resentencing hearing, he "presented testimony and visual charts that showed that [his] sentence was not only longer than any other defendant in this case, even though his guidelines were similar, but also that his sentence was longer than those of other federal defendants nationally who had committed the same or more serious crimes, including murder." He also contends that the district court failed to "adequately explain" why he "deserved a higher sentence than other defendants in his case or other defendants nationally who committed similar offenses."

The record makes quite plain, however, that the district court *did* explain that it was intentionally ensuring that Abed received the highest sentence of those involved in the racketeering enterprise precisely because he "was the most culpable." What is more, the court's assessment of Abed's relative culpability — at least as compared to the other members of the enterprise who did not cooperate with the government — was essentially uncontested. For instance, Abed's counsel expressly acknowledged that both she and Abed "recognize[d] that he has a greater culpability than his cousin Rayed who received 300 months" after the vacatur of his § 924(c) conviction.

19

As for Abed's claim that the imposed sentence creates an unwarranted sentencing disparity between himself and similarly situated offenders nationwide, we agree with the government that the evidence Abed points to for this argument hardly presents "an apples-to-apples comparison . . . [as] those statistics do not encompass a defendant who engaged in racketeering *and* robbery *and* multiple arsons *and* physical assaults *and* drug dealing *and* burglary *and* larceny *and* firearms offenses." Indeed, it is for just this reason that we have cautioned that relying on these types of sentencing statistics "may be treacherous because each sentencing proceeding is inescapably individualized." *Rivera-Santana*, 668 F.3d at 105. We see no ground for reversal based on Abed's claim of unwarranted sentencing disparities.

C

Abed contends also that the district court's consideration of his military history and diagnosis of severe PTSD was inadequate. In particular, he states that "the court failed adequately to explain why it was denying [him] a downward departure based on his exceptional military history or his documented mental disability deriving from those military sacrifices." He argues that the court merely "made a passing reference to [his] military history and resulting disability" and maintains that the court "never address[ed] why those two considerations did not warrant a downward departure to a below-guideline sentence under the very provisions in § 5H of the guidelines that expressly support their consideration."

20

An obvious flaw with this argument is that Abed did not seek a downward departure under U.S.S.G. § 5H at his resentencing hearing. Rather, he sought "a sentence within the range recommended by the" Guidelines (188 to 235 months), or if the court instead decided it could impose an above-Guidelines sentence, he stated that "a sentence of 312 months [would be] adequate but not greater than necessary to meet the objectives of the sentencing statute."

To be sure, Abed did emphasize his combat service and associated PTSD in arguing that the court should impose a sentence that amounted to time served. But the district court explained that it *was* considering Abed's military service and PTSD in choosing its selected sentence. The court stated that it was "pretty compelling" that "at the time that some of these crimes were going on, [Abed] was also seeking treatment at the [Veterans Affairs] Medical Center for PTSD." The court also acknowledged that at the time of Abed's original sentencing in 1998 there was not the same "recognition . . . as to what a serious problem" PTSD was for veterans. The court ultimately concluded, however, that notwithstanding Abed's military history and PTSD, the time-served sentence that Abed was requesting would not be sufficient to satisfy the § 3553(a) factors given the "nature and circumstances of the offense" and Abed's relative culpability as compared to other members of the enterprise.

In view of this record, we cannot conclude that the district court erroneously failed to take Abed's military service and PTSD into account. *See United States v. Nance*, 957 F.3d 204, 214–15 (4th Cir. 2020) (explaining that where the record of the defendant's sentencing "makes clear that the district court has meaningfully considered [his]

21

nonfrivolous mitigating arguments, fulfilling its obligation to provide a rationale tailored to the particular case at hand and adequate to permit meaningful appellate review, we will not require more" (cleaned up)).

D

Abed contends next that although his was purportedly a plenary resentencing, the district court erroneously treated his "original sentence as a starting benchmark." In a similar vein, he argues that the court failed to explain adequately the extent of the upward variance it imposed, arguing that "[t]he brevity of the court's statement of reasons . . . is sufficient reason alone to reverse an upward [variance] of this magnitude."

In "all sentencing proceedings," including a resentencing hearing like the one conducted here, district courts are required to use the Guidelines' advisory range as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). And when a "court decides that a sentence outside the Guidelines' advisory range is appropriate, it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Zuk*, 874 F.3d 398, 409 (4th Cir. 2017) (cleaned up). "The Guidelines are not the only consideration, however." *Gall*, 552 U.S. at 49. District courts must also "giv[e] both parties an opportunity to argue for whatever sentence they deem appropriate" and then must "consider all of the [factors under 18 U.S.C.] § 3553(a) . . . to determine whether they support the sentence requested by a party," making "an individualized assessment based

22

on the facts presented" without "presum[ing] that the Guidelines range is reasonable." *Id.* at 49–50.

Thus, we agree that it would have been improper had the district court used Abed's original sentence — rather than his advisory sentencing range — as an initial benchmark at his resentencing. But based on our review of the sentencing proceeding, we are satisfied that it did not do so. The court said that it was "start[ing]" its determination of Abed's sentence "with consideration of the advisory sentencing Guidelines," which, it noted, produced a range of "188 to 235 months." Indeed, the court recognized that it was "required" to "start[]" with the Guidelines "under current law." While the court did also reference Abed's original 570-month sentence, it generally did so to make the point that Abed's receipt of a sentence longer than that received by "any other person in this case" was reflective of his greater culpability according to the judge who conducted the lengthy trial, a factor that was entirely appropriate for the court to consider. The court also referenced Abed's original sentence in stating that it did "not believe that a sentence in the range of 570 months . . . or anywhere near that [range] me[t] the statutory obligations" that governed "this plenary resentencing" and in stating that there were a number of reasons "to lower the sentence down below the range that he was originally sentenced to." But these references are best understood as part of the court's explanation for why it was rejecting the *government's* argument for "a sentence at or near the previously-imposed sentence of 570 months."

In addition, we do not find persuasive Abed's argument that the district court failed to adequately explain why it was imposing a variance sentence. Certainly, having

concluded that "an outside-Guidelines sentence [was] warranted," the court was required to "consider the extent of the deviation and ensure that the justification [was] sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. But the record here reflects precisely why the district court concluded that a substantial upward variance to 360 months' imprisonment was necessary to satisfy the § 3553(a) factors. It explained that, "for a number of years," Abed was "involved in a widespread series of crimes" that included arson, drug conspiracy, burglaries, and "a whole pattern of violent criminal behavior," yet his advisory Guidelines range failed to account for the "scope and severity of [this] criminal conduct." Based on these and other statements made in the course of a thorough sentencing hearing and in the court's written statement of reasons, we have little difficulty in concluding that the district court adequately articulated its reasons for imposing the upward variance.

E

Finally, Abed contends that it was substantively unreasonable for the court to have imposed a sentence of 360 months' imprisonment given the combination of his mitigating evidence regarding his combat service and PTSD and his extensive rehabilitation evidence regarding his transformation during his more than 20 years in custody.

In reviewing the substantive reasonableness of a sentence, we "examine[] the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). "Where, as here, the

24

sentence is outside the advisory Guidelines range, we must consider whether the sentencing court acted reasonably both with respect to its decision to impose such a sentence and with respect to the extent of the divergence from the sentencing range." *Nance*, 957 F.3d at 215 (cleaned up). In doing so, however, we "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51. Though not unlimited, the deference owed is considerable, and "[t]he fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*

In maintaining that his 360-month sentence was substantively unreasonable, Abed emphasizes his evidence regarding his military service and the severe PTSD that resulted from it, as well as his abundant rehabilitation evidence. Nonetheless, as noted, the record reflects that the district court considered both the mitigation and rehabilitation evidence presented and weighed it against the serious "nature and circumstances of [an] offense" that involved "a widespread crime spree for a number of years." While reasonable jurists could perhaps have balanced those competing factors differently and arrived at a different result, we cannot conclude that this is "one of the rare cases where . . . the sentence imposed by the district court was substantively unreasonable in light of the § 3553(a) factors." *Zuk*, 874 F.3d at 412.

\*     \*     \*

During the extensive resentencing hearing, the district court repeatedly recognized how Abed had turned his life around in prison. The court said that "he is a changed person, a rehabilitated person, . . . a different person now." Yet the court also appropriately

25

recognized that the sentencing standards demanded a proportionate punishment for the lengthy, malicious, and damaging conduct in which Abed had engaged as a young man. Nonetheless, after explaining its chosen sentence, the court reiterated to Abed, "You have made great strides in your life to turn your life around with the help of your family. I wish you the best."

While we reject Abed's challenges to his 360-month sentence and affirm the district court's balanced approach, we too want to recognize the great strides that Abed has taken toward his rehabilitation. Based on the record, we are optimistic that Abed can look forward relatively soon to reentering society, reuniting with his family, and leading a constructive and indeed joyful life.

The judgment of the district court is

AFFIRMED.